ALEXANDER EWING, Appellant, *v.* CORNELIUS RUNKLE, Appellee.

### APPEAL FROM KNOX.

Under the statute of frauds and perjuries, it must be the intent of both parties to a conveyance, in order to render it void, to practice a fraud; that it has the effect to delay and hinder creditors, does not bring it within the statute.

The conveyance to be void, must be contrived of malice, etc.; if it is made by the consent of other creditors besides the grantee, duly acknowledged and recorded, absolute on its face, without any secret trust, it will be good, although the grantee is first to be paid, and the residue of the proceeds of the property is to be divided among other creditors of the grantor.

Where one of several creditors, by consent of others, took a bill of sale from a failing debtor, of certain personal property which was scattered, with the agreement that he was to collect the property, be paid his expenses in doing so, and out of the proceeds pay his whole debt, and divide the surplus among the consenting creditors, the transaction being in good faith, it was held, that the contract was not within the statute of frauds and perjuries, that the taking a judgment by this creditor did not defeat the agreement, and that the consenting creditors were bound by it, and that the property acquired by the bill of sale, before any liens attached, should be protected in the creditor.

Instructions should be so given as not to leave the jurors to conjecture about the truth, but so as to direct their minds to the facts as proved.

THIS was an action of trespass, commenced in the Knox Circuit Court, to recover the value of two wagons and seven horses, claimed by the plaintiff, and was tried in that court,

THOMPSON, Judge, presiding, before a jury, at October term, 1857. Verdict and judgment for defendant. A motion for a new trial was overruled.

Pleas were filed as follows:

The general issue.

That on the 20th day of August, 1856, seven attachments were issued out of the Circuit Court of Knox county, against Smith A. Brown and Ira Brown, as follows: One in favor of Hugh and Washington Hagey; one in favor of Robert C. Price; one in favor of Thomas P. Benson; one in favor of John Eiker and others; one in favor of Miles Smith; one in favor of Nathan Barboro; one in favor of John Pendegrast: All of which were returnable to the September term, A. D. 1856, of said court.

That said attachments were levied on the property in controversy by defendant, who was then sheriff of said county, on the 20th of August, as the property of Smith A. Brown and Ira Brown, whose property it really was.

That personal service was had on the Browns, and judgment rendered in each of the attachment suits for plaintiff, at the September term, 1856.

That on the 28th day of September, 1856, execution issued in favor of Price, and on the 1st day of October, 1856, executions issued on the judgments in favor of Hagey and Benson.

On the 6th of October, executions issued in favor of Eiker and Smith.

That at the September term, 1856, the plaintiff, Alexander Ewing, recovered a legal judgment against Smith A. and Ira Brown, for the sum of $1,555.40 and costs, and execution issued thereon on the 28th day of September, 1856.

That said executions were delivered to the sheriff as follows: Price, 29th September, 1856; Benson, 4th October, 1856; Eiker, 6th October, 1856; Ewing, 29th September, 1856.

That said executions were levied by the defendant, who was sheriff, on the property sued for, as the property of Brown & Son, on the 20th day of October, 1856, and said property was sold at public auction on the 1st day of November, 1856, by the defendant, as sheriff. The plea then alleges that personal service was had in each of the attachment cases, and that general judgments were rendered therein, and that the executions were levied upon the property as the property of Smith A. and Ira Brown, whose property it really was.

The third plea sets up a license from the plaintiff to the defendant to commit the trespass set forth.

Alleges that Ewing, the plaintiff, did, at the September term, A. D. 1856, of the Knox Circuit Court, recover a legal judg-

ment against Smith A. and Ira Brown, for the sum of $1,555.40 and costs of suit — that execution issued thereon, on the 28th September, 1856, and on the 29th day of the same month, was placed in the defendant's hands (who was then sheriff,) for service, and that the defendant levied said execution upon the property in controversy, for the benefit of the plaintiff.

A demurrer to the fourth plea was sustained by the court.

1. Issue was joined on defendant's first plea.

2. To the second plea, plaintiff replied that no such attachments were issued and placed in the hands of the sheriff, as set forth in said plea.

3. Replication to second plea, that no such judgments were rendered.

4. Special replication to second plea, that no such executions were issued.

5. Special replication to second plea, that said attachments and executions were not levied on the property described in said plea.

6. Special replication to second plea, that said goods and chattels were not the property of Smith A. and Ira Brown, but was the property of plaintiff.

7. Special replication to second plea, that the judgment and execution against Smith A. and Ira Brown, in favor of Ewing, was obtained without the knowledge or consent of plaintiff.

8. Replication to third plea, denying the license.

There was a special rejoinder to plaintiff's seventh special replication, which alleged that the judgment and execution were obtained with the knowledge and consent of Ewing.

Issue was joined to the country on all the replications.

The plaintiff, to sustain the issue on his part, introduced the following bill of sale:

KNOW ALL MEN BY THESE PRESENTS, That we, Smith A. Brown and Ira Brown, copartners under the name, style and firm of S. A. Brown & Son, have bargained, sold, and by these presents do bargain, sell, transfer and set over and deliver unto Alexander Ewing, of the county of Knox, and State of Illinois, the following property, to wit: One span of horses; one grey, and one bay, with a white face; one span, one bay, and one sorrel, with white face; one span of black horses; one span, one small grey and bay; one cream colored mare, and one roan horse; one sorrel mare, and one sorrel horse; one large bay horse; one small bay horse; one small sorrel horse; one dark bay or brown horse; one span of spotted horses; one small bay, with white stripe in the face, and one glass eye, as it is called; one light grey, with big joint on hind leg; one large black horse, little knee sprung; one dark bay horse, grey hairs intermingled; one span of old horses, one black or brown, and the other dark brown; one bay horse, and one bay or sorrel mare, and one bay mare, in the possession of S. A. Brown; two yoke of oxen, one yoke black and white, and one yoke red and white; fifteen lum-

Ewing *v.* Runkle.

ber wagons, twelve two-horse plows, fifty scrapers and fifty log chains, four hundred shovels, ten crowbars, fifteen sets double harness, one log wagon, a lot of double trees, whipple trees, clevises and chains; also, one shanty, at Swab Run, in possession of Dennis Burk; one at French Creek, in possession of Roger Mack; one in the possession of Litey Patrick, near O'Selby's; one between Maquon and Haw Creek, occupied by Mooney; one near Dempsey's, in possession of John O'Harren; another close by, put up by Abner Brown; another at Haw Creek, occupied by John Long; a lot of hewed timber, at Haw Creek, and a lot at Galesburg, delivered to S. A. Brown & Son, for the sum of five thousand dollars, duly paid by the said Alexander Ewing to the said S. A. Brown & Son, the receipt of which is hereby acknowledged; to have and to hold all and singular the above described goods, chattels and personal property, to the said Alexander Ewing, his heirs and assigns, forever, as his sole, absolute property, hereby delivering and investing the said Ewing with the possession of said goods, chattels, and effects, and full and ample power to take possession of the same wherever found, hereby imparting and conveying to said Ewing, complete and absolute control over the said goods, chattels and personal property, as fully and amply as we may have, hereby warranting and defending the title and possession of said goods, chattels and personal property, to and in the said Ewing, his heirs and assigns forever.

In witness whereof, we have hereunto set our hand and seal, this 27th day of August, A. D. 1856.

S. A. BROWN & SON. [SEAL.]

This bill of sale was acknowledged and recorded on the 29th of the same month.

The plaintiff then called *S. A. Brown*, who testified that the bill of sale was made on the day of its date, at Knoxville, for the purpose of securing his indebtedness to the plaintiff Ewing; that Brown & Son were indebted to plaintiff, to secure which they gave Ewing twelve notes, all dated 9th August, 1856, amounting to $1,316.96; that he sold Ewing a span of horses, for $325, which was to be credited on the notes; that some account was made with Ewing after the notes were given; that the bill of sale was given to secure said notes and account, and to pay the same; that at the time of the date of said bill of sale he was in the county of Warren, and came down to Knoxville a day or two afterwards, for the purpose of signing and acknowledging said bill of sale; that at the time of the making of the bill of sale, the property described therein was very much scattered in the counties of Knox, Fulton and Peoria, along the line of the Peoria and Oquawka Railroad, and some of it had been taken out of the State. That he had been contractor on said road, and employed a large number of hands. That he had failed, and was unable to pay them their wages, and some of them had taken some of the property and hid it in the woods, and some of it was buried in the ground. Some of the cattle and horses were levied on by attachment, some of them run

off by workmen, and some hid in the woods. That some of the Irish on the road had threatened personal violence towards him, and that he had left the work and gone home to Warren county, where his family resided.

He further testified, that all the property mentioned in the bill of sale was worth at least $7,000. That the same was sold to Ewing, to pay the indebtedness of S. A. Brown & Son to Ewing, being the notes and the book account. That the notes had never been surrendered, but were still held by Ewing. That they had never received any discharge of their indebtedness to Ewing, excepting the bill of sale. That at the time the bill of sale was made, they (said S. A. Brown & Son) were in failing circumstances, and owed more than they could pay, and had stopped business some days before sale bill was made. Ewing was fully aware of our condition, and wanted to secure his claims against us. When we gave the notes, Ewing wanted security, and proposed two ways—one by taking small notes and a power of attorney to confess judgments before a justice of the peace, and issue executions; the other by taking mortgage on personal property. But this last was objected to, because it might alarm his other creditors. That the first mode was adopted, and judgments were confessed before Sanburn, justice of the peace. I signed the bill of sale because it was the best thing that could be done. Some of the property had been attached in this court and some before Justices' Court, in Maquon. The attachments were issued and levied because people supposed I had gone out of the State; but I had not.

When I gave the notes, plaintiff wanted security. He thought I would break up, but I thought not. I said I would give him any security, but declined giving chattel mortgage, because it would make it public.

I did not sign the bill of sale with intent to hinder or delay creditors. That it was my understanding that Ewing was to gather the property together, and pay himself for his trouble and expenses, then pay my indebtedness to himself, and if there was any left, to divide it among my creditors in equal portions. I agreed to pay Ewing for his time and trouble in looking up and getting together the property. That Ewing was to pay all liens upon the property, where the claims were honest and fair, by advancing the money. That he did advance, to one Thomas Kerns, the sum of fifty dollars, to pay his debt, which was just, said Kerns having attached a span of horses; and also to Jesse Pickrel the sum of fifty dollars, for a similar purpose. That the sale was in good faith, for the purpose of having it gathered together for the benefit of my creditors, after paying Ewing's debt.

Ewing v. Runkle.

The plaintiff then called *Erastus Rice*, who testified, that S. A. Brown wanted him to come to Knoxville and make any arrangement he thought best for his benefit and for the benefit of his creditors. I came up, and, by my advice, Ira Brown came also. This bill of sale was then executed; was then drawn up and executed as far as it then could be. The consideration was, to pay Brown's debts and save the property from being squandered. It was my judgment, and Ewing's, and Brown's, that there was property enough to pay all the debts. Ewing's debt was about a thousand dollars. The intention was, to sell all the property the Browns had on the line of the railroad. Some attachments were then issued at Knoxville, and some at Maquon, on the ground that Brown had left the State. The sale was not made to hinder, or delay, or defraud any one. Ewing was to be paid expenses in collecting the property. If the plaintiff got enough to pay his debt, he was to be paid, and his expenses. The same offer was made to James Price. Ewing took the bill of sale. It was talked that Ewing might have to pay off some small debts. In cases where a small debt was levied on property worth more than the debt, they were to be paid. Nothing was said about paying Ewing for his trouble. Another talk was, that when Ewing got all the property together, all Brown's creditors should meet and bid it off to pay their debts.

Ewing was to gather up all the property, and then it was to be disposed of for the benefit of all the creditors. The talk was, that if not much property was got, that Ewing was to be paid, and his expenses. It was thought there was enough to pay all the debts. Several of the creditors were present—I think Hagey, Armstrong and Price.

*H. N. Keightley* stated that he drew up bill of sale. Brown would not sign it. Ewing did not know that I went to Warren. Price came the next day, and said the only way Ewing could be safe was to take the bill of sale. The property was scattered and some attached before justices of the peace; some in Knox, some in Fulton and Peoria, as I was told. Armstrong, James Price and Hagey were out and in the office at the time the arrangement was made. Ewing first refused to take a bill of sale; said he had about as soon lose his debt as to gather the property. All appeared to be afraid of the risk. We suggested to Price to take the sale bill. We offered it to James Price and to Hagey. I prevailed on Ewing to take the bill of sale. It was agreed, by all present, for Ewing to take it, and to take out his debt first, if there was not enough to pay all. It was offered to Price and Hagey in the same way. They refused to take it. I offered to transfer the bill of sale to them if they would pay Ewing's debt. The agreement was, that Ewing was

to have his pay and his expenses in getting the property together. There were attachments then pending. I think the attachments were then issued, but not levied. Rice came, and the arrangement was made the 27th of August. Some claims and debts were right and just, and Brown was not willing to let Ewing have sale bill without his agreeing to pay the just debts in suit in Justices' Court. One span spotted horses, in Fulton county, claim on them was fifty dollars, by Carnes. Carnes said, if Ewing would pay the fifty dollars, he might have the horses. Brown said the claim was right, and Carnes said Ewing paid it. Was a claim of fifty dollars, by Pickrel, on a team. Ewing spent twelve or fourteen days gathering up property. I notified the defendant of the bill of sale the very day it was made, and forbid his touching anything further. Don't think he made any particular reply. James Price, Hagey, Grimes, Burtnett and Thompson went along to help find property. Ewing brought home from ten to fourteen horses and two yoke of oxen. The oxen, and two or three horses, and some plows and scrapers were afterwards sold on executions that were prior liens. Ewing got four or five double wagons and two old wagons. One wagon and two horses were replevied by Potter, and retained. Cannot say Ewing gathered the ones replevied. Ewing got some chains.

On the part of the defendant, *George F. Harding*, being sworn, stated : I had a power of attorney, from Brown & Son, to confess judgment in favor of Browns' creditors, against them. I had power to confess in favor of Ewing, for $1,000. Afterwards, $500 was added to this amount. Thinks the $1,000 mentioned in power of attorney was the residue due Ewing on the notes.

He next offered in evidence the writs of attachment before mentioned, which were in due form, and dated 20th August, 1856, with the return of the sheriff as to the levy and sale.

The execution in favor of Hugh D. and Washington Hagey, was issued 1st October, 1856.

The execution in favor of Thomas P. Benson was issued on the 1st day of October, 1856.

The execution in favor of John Eiker and D. M. Eiker was issued on the 6th October, 1856.

The execution in favor of Miles Smith was issued 6th October, 1856.

The execution in favor of Alexander Ewing was issued 28th September, 1856.

On this execution was the following return :

I, Cornelius Runkle, sheriff of Knox county, Illinois, do hereby certify, That, in the following cases in the Circuit Court of said county, commenced by attach-

Ewing *v.* Runkle.

ments against the parties hereinafter named as defendants, returnable at the September term of said court, A. D. 1856, to wit: Hugh and Washington Hagey *vs.* Smith A. and Ira Brown. Thomas P. Benson *vs.* Smith A. and Ira Brown. John Eiker and others *vs.* Smith A. and Ira Brown. Miles Smith *vs.* Smith A. and Ira Brown. Robert C. Price *vs.* Smith A. and Ira Brown. Nathan Barboro *vs.* Smith A. and Ira Brown. And John Pendegrast *vs.* Smith A. and Ira Brown. In all of which cases general judgment was rendered, except the last two, which were continued. The following property being the same property named in my return written on the attachment issued in said court, was levied upon by me, to wit: seventeen horses, four of which and one set of double harness, and two double wagons I never had in my possession, the same having been levied on by Joshua Lowman, a constable, in attachment from Justices' Court, issued and levied on the same, before the levy in the above causes, which suits are undetermined, and I could not find the property, to sell the same, as it was secreted from me. Also, said attachments were levied by me upon two yoke of oxen and yoke, seven double wagons, and six and a half sets of double harness, and three shanties. Three of said horses, two yoke of oxen and yoke, and two sets of double harness, were sold by M. Smith, constable, upon executions in his hands, which were prior liens as against said attachments, and two and a half sets of harness. Three horses and one wagon were replevied out of my hands by A. S. Potter, which suit is undetermined. The said four horses stated as being in Joshua Lowman's hands, and two wagons and one set of harness, were levied upon by said Lowman, under attachment from Justices' Court, before my levy, which suits in Justices' Court are undetermined. The said shanties were claimed by other parties than the defendants and were removed, so the same could not be sold by me. The remainder or other harness never came to my hands.

And I further certify, That by virtue of execution issued out of the Circuit Court on the judgments as aforesaid recovered, and by virtue of an execution issued out of the same court, in favor of Alexander Ewing *vs.* said Smith A. Brown and Ira Brown, recovered at the same term, I levied upon and sold property as follows, that was attached for the following prices, to wit: which sale was made on the 20th day of October, 1856, excepting as to property sold to B. Booth and W. H. Smith, which was sold on the 1st day of November, 1856:

| | | |
|---|---|---|
| One double wagon to H. D. Hagey, for | | $72.00 |
| One " " to R. Benson, for | | 79.75 |
| One " " to T. Carnes, for | | 54.25 |
| One black horse to J. Pendegrast, for | | 99.00 |
| One " " to J. Smith, for | | 116.00 |
| One bay " to Casteel, for | | 63.00 |
| Received from M. Smith, balance on sale of oxen | | 18.78 |
| One sorrel horse to B. Booth, for | | 72.00 |
| One grey horse to W. H. Smith, for | | 30.25 |

And I further certify, That under said executions, I levied upon the property of Smith A. and Ira Brown, and sold on 1st day of November, 1856, property not attached, as follows:

| | | |
|---|---|---|
| One spotted horse to Isaac Masten, for | | $108.00 |
| One " " to H. D. Hagey, for | | 102.00 |
| One sorrel " to E. Lotts | | 96.00 |
| One brown " to E. Patrick | | 70.00 |

And I further certify, That one wagon, levied on by the attachment writs by me, was replevied by Alexander Ewing, and has not yet been returned ; and that two of the horses attached were run off by one Croucher, and have not been returned.

And I further certify, That the property levied upon as aforesaid by the above named attachments, was, after said levy, attached by me on a writ of attachment issued from Warren Circuit Court, in the case of Armstrong and others vs. said Smith A. and Ira Brown.

C. RUNKLE, <em>Sheriff.</em>

It was then agreed that Keightley ordered out an execution on the judgment confessed in favor of Ewing, on the day the same was confessed.

It was then agreed that defendant was acting sheriff of Knox county at the time of the levy and sale, and acted as such in so doing.

It was then admitted that the property replevied by the plaintiff, in the suit against Runkle, had since been taken out of his possession, by one Potter, on a writ of replevin, and that Potter held said property, except one wagon.

The plaintiff then asked the court to instruct the jury as follows:

1. Before the jury can find the sale from Brown to Ewing *fraudulent*, they must believe, from the evidence, that Ewing intended to *delay*, hinder or defraud the creditors of Brown.

2. If the sale was made in good faith, for the purpose of gathering the property, and paying Ewing first, and dividing the balance of the property among the creditors, such sale is valid and binding, and passed the title to so much of the property as Ewing was able to reduce to possession.

3. If the creditors knew the object and intention of the bill of sale, and assented thereto, they cannot afterwards insist that it was fraudulent.

4. If the sale was fair and honest at the time it was made, the legal title to so much of the property as Ewing reduced to possession, passed to him ; and any effort on the part of the creditors, or of Ewing, to procure judgments afterwards against Brown, would not render the sale void.

5. If the sale was *fair* and *honest* when it was made, the obtaining of a judgment afterwards by Ewing against the Browns, would not render such sale fraudulent or void.

6. If the judgment in favor of Ewing against the Browns was obtained without his knowledge or consent, and if he did not consent to it when informed of its existence, such judgment cannot be used to his injury.

7. A debtor, in failing circumstances, has a right to prefer one creditor over another, and pay him in full, if he chooses to

Ewing *v.* Runkle.

do so. And he may lawfully assign all his property to pay one creditor, and divide the remainder, after such payment, among his other creditors.

8. Brown had a legal right to defend against the attachments, and to employ counsel for that purpose, and his doing so is of itself no evidence of fraud.

9. If the attachments were illegally issued, and without any cause, everybody interested in the property attached had a right to defend and defeat them, and the doing so is no indication of fraud.

10. The return of the officer upon the attachments and executions in this case, are only *prima facie* evidence for the defendant, and may be disproved or contradicted by parol evidence.

11. If the jury believe, from the evidence, that the attachments from the Circuit Court were *levied* upon the property in controversy, *without seeing it,* and without the property being present when the levy was made, such levy is illegal and void, as against subsequent purchasers in good faith.

12. If the agreement between the Browns and Ewing, with the knowledge and consent of the Browns' other creditors, was that Ewing was to receive the property in controversy, on the bill of sale read in evidence, and to either first pay himself, and the balance to go to the other creditors, or for the property to be divided amongst all the creditors, and he did so receive the possession of the property, then, in either event, Ewing was the legal owner of the property, and held it as trustee for himself and other creditors.

Unless the same was fraudulent in fact.

All of which were given except No. 5, which the court refused, and plaintiff excepted.

The defendant then asked the court to instruct the jury as follows :

1. If the jury believe, from the evidence, that the several writs of attachments issued in favor of Browns' creditors, were duly issued, and levied by the defendant, as sheriff, in the proper discharge of his duties, on the property in controversy in this cause, before the sale of the said property, by the Browns to Ewing, and that this is the only trespass complained of, then they will find for the defendant.

2. If the jury believe, from the evidence, that the sale of the property in controversy, from the Browns to Ewing, was made with the intent to *hinder* or *delay* the other creditors of the Browns, in the collection of their debts, then such sale is void, as to such creditors ; and in such case, it makes no difference if Ewing was a creditor of the Browns, and was to have his debt paid by such sale.

3. If the jury believe, from the evidence, that the sale bill to Ewing was only intended to be a security for the payment of Ewing's debt, and that after making such sale bill, either by himself or attorney, with his knowledge and consent, Ewing voluntarily took a judgment in the Circuit Court, against the Browns, for his said debt, in lieu of the said sale bill, then such judgment was an extinguishment of said sale bill, and the property became released therefrom, and liable to be taken on execution or attachment issued against the Browns, notwithstanding the said sale bill.

4. If the jury believe, from the evidence, that a part of the property described in the sale bill was sold to Ewing to *hinder* or *delay* the Browns' creditors, or any of such creditors, in the collection of their demands against the Browns, then the said sale bill is void entirely, and cannot give the plaintiff any right to recover in this action.

5. If the jury believe, from the evidence, that the sale bill to Ewing was made with a private or secret understanding between the parties thereto, that Ewing's debt should first be paid out of the property therein described, and that then the balance should, at *Ewing's discretion*, be applied for the benefit of the Browns' other creditors, then such bill of sale is void, as to all such other creditors as have not assented to such secret understanding. And if this is so, and the said bill of sale is the only foundation and evidence of the plaintiff's title in this case, and the defend-. ant levied legal writs on the property, in the due discharge of his duty, and this is the only trespass proved against the defendant, the jury must find in favor of the defendant.

6. If the jury believe, from the evidence, that at the time of the making of the bill of sale, there was any secret or private trust, injurious to the rights and interests of the other creditors of the Browns, and in regard to the manner in which the property or its proceeds should be applied, and different from that expressed on the face of the bill of sale, then such sale bill is void, as against such other creditors of the Browns, if the carrying out such trust would hinder or delay such creditors in the collection of their debts.

7. If the jury believe, from the evidence, that the sale bill to Ewing was only intended as a payment of Ewing's debt against the Browns, which amounts to only something over one thousand dollars, and that said bill of sale was not intended as an absolute and *bona fide* conveyance of such property, and that said sale bill conveyed property of the value of from five thousand to seven thousand dollars, then such bill of sale is voluntary, as to the excess of the value of such property over Ewing's debt, and as such, void, as against the Browns' other creditors.

8.   The sale bill from the Browns to Ewing, is absolute on its face, and if at the time of making the same, there was any secret understanding between the parties to such bill of sale, as to the disposition of the property thereby conveyed, which would be injurious to the rights and interests of the creditors of the Browns, then such sale bill is void as against such creditors' rights and interests; and, therefore, if the jury believe, from the evidence, that the writs given in evidence were duly issued and levied on the property by defendant, and such writs were in favor of such creditors, and that said sale bill shows the only title which the plaintiff had to such property, they will find in favor of defendant, if such levy is the only trespass proved against defendant.

9.   If the jury believe, from the evidence, that it was a part of the agreement, upon which the bill of sale from the Browns to Ewing was given, that the attachment suits then pending against the said Browns should be defended, and the plaintiffs in said suits prevented from obtaining judgments, and collecting their just debts, or hindered or delayed in so doing, this renders the said bill of sale void as against such creditors, if the jury believe, from the evidence, that said suits were rightfully brought, and that the plaintiffs were entitled to maintain them.

10.   If the jury believe, from the evidence, that it was a part of the understanding or agreement, and that it was secretly made between the Browns and Ewing, upon which the bill of sale was made, that said Ewing should account to the said Browns, or either of them, or to any other person for their benefit, for all of the property mentioned in, or conveyed by said bill of sale, not necessary to pay said Ewing's debt; this secret agreement or understanding would render the bill of sale void, as against the creditors of the Browns, and would not authorize the plaintiff to recover in this suit, so as to injure their rights.

11.   If the jury believe the plaintiff, by himself, or attorney, with his knowledge and consent, obtained a judgment against the Browns, for the same debt intended to be secured or paid by the bill of sale, after the execution of such bill of sale, that he caused the execution in his favor, shown in evidence, to be placed in the hands of the defendant, as sheriff, to execute, and that he, or his proper attorney, gave the defendant license to levy the same on the property described in the declaration, and that the defendant levied said execution accordingly, with other executions, and that these levies are the only trespasses proved in this cause, then they will find for the defendant.

12.   If the jury believe, from the evidence, that Ewing obtained a judgment, as mentioned in the last instruction, and caused, by himself or attorney, an execution to be issued thereon,

which came duly to the hands of the defendant, as sheriff, to execute, this would be *prima facie* evidence that said Ewing gave the defendant authority to levy such execution on the property of the said Browns, wherever he might find the same, in said defendant's county.

13. The jury is instructed, that if they believe, from the evidence, that the property in controversy, at the commencement of this suit, was the property of Alexander Ewing, John Ewing, and Albert Burdett, and not of the plaintiff alone, and that the property was taken from the possession of the said Alexander Ewing, John Ewing, and Albert Burdett, or from the possession of their agent, they will find for the defendant.

All of which were given, except No. 13.

The plaintiff moved the court for a new trial, which was denied.

WEED & WILLIAMSON, for Appellant.

MANNING & LANDER, for Appellee.

BREESE, J. The principal question in this case, arises out of the instructions given on behalf of the defendant, Runkle, in which a construction was given to our statute of "Frauds and Perjuries," Chap. 44, sec. 2, R. L., 258, to which it seems to us not to be entitled.

The language of that part of this section necessary to be noticed, is as follows: "Every gift, grant or conveyance of lands, tenements, hereditaments, goods or chattels, or of any rent, common or profit of the same, by writing or otherwise; and every bond, suit, judgment or execution, had and made, or contrived of malice, fraud, covin, collusion or guile, to the intent or purpose to delay, hinder or defraud creditors of their just and lawful actions, suits, debts, accounts, damages, penalties or forfeitures, or to defraud or deceive those who shall purchase the same lands, tenements or hereditaments, or any rent, profit or commodity out of them, shall be from thenceforth deemed and taken only as against the person or persons, his, her, or their heirs, successors, executors, administrators or assigns, and every of them, whose debts, suits, demands, estates and interests by such guileful and covinous devices and practices as aforesaid, shall, or might be, in anywise disturbed, hindered, delayed or defrauded, to be clearly and utterly void;" and, moreover, if the conveyance "be of goods and chattels only, then acknowledged or proved by two witnesses before any court of record, in the county wherein one of the parties live, within eight

months after the execution thereof, or unless possession shall really and *bona fide* remain with the donee."

This section is substantially a transcript of the statute of 13th Eliz., Chap. 5, and is the basis of all American jurisprudence on this subject. It is, however, only declaratory of the common law, whose antipathy to every species of fraud is so well known and understood. 2 Bac. Abr., "Fraud;" 2 Com. Dig., " Covin."

The emphatic words of this section, the test words, by which the validity of voluntary assignments is tried in all our courts, are, " with the intent or purpose to delay, hinder or defraud creditors."

Every conveyance, having the effect to delay or hinder creditors, of their just and lawful actions, suits, debts, etc., is not therefore fraudulent within this statute, for such is the effect of all voluntary assignments, made expressly for the benefit of creditors, and which the courts will always sustain. But the conveyance must be " had and made, or contrived of malice, fraud, covin, collusion, or guile," with that intent, to bring it within the statute, and both parties, grantor and grantee, must have that purpose in view.

Was this conveyance to Ewing of that sort? Where is the evidence of the " malice, fraud, covin, collusion or guile ;" words of great meaning and of vast importance, in construing this statute ?

The facts of the case show that Brown and Son, who conveyed to Ewing, were broken down railroad contractors, largely indebted, and perhaps of considerable property, valued at about seven thousand dollars, scattered over the country ; part of it claimed by other parties, some secreted, some run off, and a large portion of it seized on writs of attachment, and such the state of feeling against the Browns, that it was hazardous for them to search for, and collect the property, or meddle with it.

Ewing, Price, Hagey and Armstrong, creditors of the Browns, Ewing to the extent of one thousand dollars, met and consulted on the subject, when it was agreed that Ewing should take a bill of sale of the property, collect it together, pay himself out of it, and then divide the balance among the creditors of Brown and Son. Ewing, accordingly, took the bill of sale, and at considerable expense, collected a portion of the property, to the value of about fifteen hundred dollars, paid out money to relieve it from claims made on it, and brought it to Knoxville, where, it seems, these other creditors who had made this agreement, were ready, with executions in the hands of the sheriff, to levy upon it, who did seize and sell it, as the prop-

erty of Brown and Son, and which acts are the foundation of this suit.

We think it very clear, that there is no evidence whatever of such fraud as is contemplated by the statute. There must be fraud in the getting up, and setting on foot, the conveyance, and not merely the execution of a conveyance, which may delay or hinder other creditors. A vigilant creditor is entitled to all legal advantages, and can protect himself by a *bona fide* transaction.

The conveyance, to be void, must be made and *contrived* of malice, fraud, covin, collusion or guile, and the intent must be marked by these characters, or some one of them. As Lord MANSFIELD observed, in *Cadogan* v. *Kennett,* Cowper's R. 434, " the question in every case is, whether the act done is a *bona fide* transaction, or whether it is a trick and contrivance to defeat creditors." And so, Chief Justice MARSHAL, in the case of the *United States* v. *Hooe,* 3 Cranch R. 88.

This conveyance seems to possess none of these ingredients, and nothing attaches to the transaction, as fully appears from the testimony, calculated to stigmatize it as fraudulent. The debt to Ewing was really due ; the deed was not made in secret, but on consultation with, and by the consent of three other creditors ; was duly acknowledged and recorded ; is absolute on its face, and no secret trust connected with it, but an open and clearly expressed declaration that, the balance of the property, after paying Ewing's debt, and expenses, should be distributed among the creditors of Brown and Son.

In the language of GROSE, Justice, in the case of *Meux et al., qui tam.,* v. *Howell and Atler,* 4 East R. 1: "It makes one shudder to think that persons who appear like the defendants, to have acted most honestly, should have been in any hazard of being subjected to punishment for having endeavored to procure an equal distribution of their debtor's effects among all his creditors. Their conduct was meritorious, and the judgment confessed by Norton was not covinous or feigned, but given *bona fide,* and upon good consideration, for debts due to the defendants and the other creditors."

It is attempted, however, to give a fraudulent color to this transaction, by the fact that after the execution of this conveyance, Brown and Son confessed a judgment in favor of Ewing, for the amount of this same indebtedness. From the testimony, it appears that this confession was made by an attorney of the court, without the knowledge of Ewing, and without his procurement, or that of his attorney, though it appears his attorney had an execution issued upon it. Be this as it may, there is no evidence that the judgment was to stand in place of the

conveyance, and taking judgment could not, independent of any agreement to that effect, release the property covered by the conveyance. Ewing might have a double security, and two distinct remedies for his debt, and avail himself of either; he insisted, however, on his bill of sale.

It is very certain, all the parties who were present at the sale to Ewing, and assented to it, ought to be bound by it, and could have no pretense to levy their executions upon the property after such assent.

As to all others who were not present and assenting, the sale is considered good, as to such property of which Ewing got possession before any liens attached. His vigilance should not go without its reward. He had an undoubted right to secure himself, and get the property in his possession for such purpose.

As to the instructions on behalf of the defendant, the views already presented fully dispose of them. Taking them in their order, the first assumes that the trespass consisted in levying the attachments, whereas, by the record, it appears that four of the horses taken and sold by the defendant, had not been seized by attachment, but had been levied on and sold on executions issued after the sale from Brown and Son to Ewing. It is agreed that such was the fact, and the instruction could not but mislead the jury.

The second instruction is too loose, and is predicated on the idea, that if it was the intention of the Browns to hinder or delay their other creditors, by making the bill of sale, it is therefore void as to such creditors. Both parties must conspire to hinder and delay, the grantee as well as the grantor, and must be made with malice, fraud, covin, etc., on the part of both. And it excludes the fact from the consideration of the jury, that certain other creditors assented to the sale.

As to the third instruction, we have already said that taking the judgment was not, of itself, an extinguishment of the bill of sale. The fourth instruction is liable to the same objections as the second. It considers the sale void as to all persons, however honest Ewing's intent may have been. It would not be just that he should suffer, if he acted honestly and with no evil intent. He must have been a knowing party to the criminal transaction, and joined in the fraud, covin and guile, and a party to all the fraudulent and covinous intents and purposes.

As to the fifth instruction, it will be perceived, there is no evidence on which to base it. *Coughlin* v. *The People*, 18 Ill. R. 266. There is no proof that after Ewing's debt was paid, he was, at his *discretion*, to pay the balance over to the other creditors. There is no proof of any secret trust or understanding, but the only trust reserved is open and patent, and is for

the benefit [of the creditors generally, and which they could enforce in a court of chancery. Had there been a benefit or advantage reserved, secret or otherwise, to the Browns, it would have avoided the deed; but there is none such, nor pretense of any. After Ewing's debt was paid, the creditors were to participate in the balance.

All the property was devoted, by the Browns, to the payment of their debts, and they seem to have acted, throughout, with the most honest intentions. The sale was as well for the benefit of the creditors, generally, as for Ewing's benefit, and much credit is due to him for his exertions in collecting it together, scattered as it was, in three or four counties, and under embarrassments of no ordinary character. He may be considered the trustee for the creditors, of the balance remaining after his debt is paid. The same remarks will apply to the sixth instruction. There is no proof on which to raise an inference of a secret trust, and in the absence of it, there is a manifest impropriety in directing the attention of the jury to that which is not in the case, and call upon them to tax their imagination, to supply the want of facts. The same is the case with regard to the seventh and eighth instructions.

As to the ninth instruction, that is calculated to mislead. It was the undoubted right and duty of Ewing, acting for himself, and as trustee for the other creditors, to defend all suits not properly instituted, whether by attachment or otherwise, and whether they were "rightfully" brought or not, was no question for the jury.

The tenth instruction, has not any evidence on which to base it, and the court should not send the jury out into the broad field of conjecture, but confine them to the facts as proven, on which, alone, instructions can be properly raised.

The objection to the eleventh instruction is as to the form. The jury are instructed, "If they believe the plaintiff, &c." Juries should be permitted to believe nothing, except that belief be occasioned by the evidence, and their minds should always be directed to that, and to that only, as the ground of their belief. To the substance of this, and of the twelfth instruction, there can be no objection.

The Circuit Court having entertained views and opinions inconsistent with this opinion, the judgment is reversed, the cause remanded, and a *venire de novo* awarded.

*Judgment reversed.*